**IN THE COURT OF APPEALS OF IOWA**

No. 15-1061
Filed May 3, 2017

**ALLEN KILLINGS,**
        Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
        Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Mary Pat Gunderson (pretrial) and Lawrence P. McLellan (trial), Judges.

Applicant appeals from the denial of his claims for postconviction relief. **AFFIRMED.**

Christopher R. Kemp of Kemp & Sease, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee State.

Considered by Bower, P.J., McDonald, J., and Goodhue, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2017).

**MCDONALD, Judge.**

Allen Killings was convicted of murder in the first degree. This court affirmed his conviction on direct appeal. *See State v. Killings*, No. 09-0739, 2010 WL 3894161, at *1 (Iowa Ct. App. Oct. 6, 2010). Killings now appeals from the denial of his application for postconviction relief, contending his postconviction counsel was ineffective in two respects. First, Killings claims his postconviction counsel constructively denied Killings the right to counsel by failing to present any meaningful challenge to the conviction. Second, Killings argues his postconviction counsel was ineffective for failing to challenge the felony-murder instruction provided to the jury.

We begin by noting there is no constitutional right to postconviction relief, postconviction counsel, or effective assistance of postconviction counsel. *See Williams v. Pennsylvania*, 136 S.Ct. 1899, 1920 (2016) (Thomas, J., dissenting); *Montgomery v. Louisiana*, 136 S.Ct. 718, 746 (2016) (Thomas, J., dissenting) ("Because the Constitution does not require postconviction remedies, it certainly does not require postconviction courts to revisit every potential type of error."). The legislature has created a postconviction relief procedure codified in chapter 822 of the Iowa Code. The Iowa Supreme Court has recognized a statutory right to counsel in chapter 822 proceedings and a corresponding statutory right to the effective assistance of postconviction counsel. *See Dunbar v. State*, 515 N.W.2d 12, 15 (Iowa 1994).

To prevail on a claim of ineffective assistance of postconviction counsel, the applicant must "ultimately show that his attorney's performance fell outside a normal range of competency and that the deficient performance so prejudiced

him as to give rise to the reasonable probability that, but for counsel's errors, the result of the proceeding would have been different." *Id.* Our review of ineffective-assistance claims—whether constitutional or statutory—is de novo. *See Lamasters v. State*, 821 N.W.2d 856, 862 (Iowa 2012).

By way of background, on July 9, 2007, a passing motorist observed what appeared to be dead body on a porch. The motorist and her passenger stopped to investigate. They discovered a dead body, later identified as Margaret Gottschalk. They called the police. Evidence collected from the scene was sent to the Iowa Department of Criminal Investigation for DNA testing. DNA from blood on the victim's clothing matched Allen Killings. DNA obtained from a cigarette butt at the scene matched the victim and Killings. Killings denied involvement in Gottschalk's death, but admitted "he might have had sex with her. Later, he denied that." *Killings*, 2010 WL 3894161, at *1.

At trial, the jury was instructed on premeditated murder and felony murder as follows:

> The State must prove all of the following elements of murder in the first degree:
> 1. On or about July 9, 2007, the defendant beat or strangled [the victim].
> 2. [The victim] died as a result of being beaten or strangled.
> 3. The defendant acted with malice aforethought.
> 4. Either:
>     a. The defendant acted willfully, deliberately, premeditatedly, and with specific intent to kill [the victim]; or
>     b. [The d]efendant was participating in either the forcible felony of robbery or assault with intent to commit sexual abuse.
> If the State has proved all of the elements, the defendant is guilty of murder in the first degree. If the State has failed to prove any one of the elements, you will then consider the charge of murder in the second degree . . . .

*Id.* at \*2.  Killings did not object to the instruction or the form of verdict.  The jury returned a general verdict, finding Killings guilty of murder in the first degree.

We first address Killings' claim of structural error.  Beyond mere ineffective assistance, "[d]efense counsel . . . may also commit structural errors."  *Lado v. State*, 804 N.W.2d 248, 252 (Iowa 2011).  Structural errors "affect[] the framework within which the trial proceeds."  *Id.*  The supreme court has recognized structural error occurs when:

> (1) counsel is completely denied, actually or constructively, at a crucial stage of the proceeding; (2) where counsel does not place the prosecution's case against meaningful adversarial testing; or (3) where surrounding circumstances justify a presumption of ineffectiveness, such as where counsel has an actual conflict of interest in jointly representing multiple defendants.

*Id.*  In cases of structural error, no showing of prejudice is necessary "as the criminal adversary process itself is 'presumptively unreliable.'"  *Id.* (citation omitted).

Killings contends his postconviction counsel was inattentive to his case and failed to subject the conviction to meaningful adversarial testing.  The record reflects Killings filed his application for postconviction relief in April 2011.  An attorney was appointed to represent Killings.  An amended application was filed on or about July 15, 2011.[1]  Trial was set for January 17, 2012.  Trial was repeatedly delayed, leading to dismissal of the case pursuant to Iowa Rule of Civil Procedure 1.944 in January 2013 and reinstatement in March 2013.  In April 2013, Killings filed a motion requesting new counsel.  That motion was denied.  Trial was reset for June 30, 2014.

---

[1] In total, five amendments were filed, the last in August 2014.

On April 14, 2014, Killings filed a motion to proceed pro se but also requesting a new attorney. On May 2, the parties were scheduled to perpetuate the testimony of Killings' trial attorneys. Killings was scheduled to participate by phone, but he hung up before the depositions started. Killings' counsel stated, "At this time [Killings has] instructed me not to participate as his attorney, so I'll just sit here and represent him in a passive participation, I guess."[2] Hearing on Killings' motion was held May 14, after which the court allowed Killings to proceed pro se while ordering the same lawyer to continue to serve as standby counsel. On June 30, the parties appeared for trial, and Killings asked the court to reconsider its ruling and continue the trial. The court continued the trial and reappointed counsel to represent Killings.

Trial occurred on October 20, 2014. The trial began with the following exchange between Killings and his postconviction counsel:

> Q. Mr. Killings, you've instructed me that you wanted to proceed in this case by yourself; is that correct? Is that a correct summary of how this is going? A. Say that again, please.
> Q. Well, when I spoke with you, Mr. Killings, you had instructed me that you didn't want to help me prepare for today's hearing, but what you wanted to do was to have your chance to speak to the judge; correct? A. That is absolutely not true.

The district court, the lawyers, and Killings then had an extensive discussion on the record regarding postconviction counsel's preparation of the case and the issues to be tried:

> THE COURT: Let me ask this question: Besides the depositions of the two attorneys, [counsel], what other—without getting into obvious attorney-client privilege, what other things have you done to prepare the case?

---

[2] Counsel did briefly cross-examine both trial attorneys.

[DEFENSE COUNSEL]: Well, Your Honor, I researched the fact—well, first of all, went through all of the transcripts from the trial, the depositions of all of the witnesses that the State had called, and attempted to identify all the possible witnesses that were available for depositions.

Then I have met with Mr. Killings several times in person down there, and we've gone over some of this information. But he hasn't been forthcoming with which individuals—he's never sent me a specific list of who he wanted to depose on any of these various witnesses.

I believe, without looking at my notes, that there were thirty-five potential people that we identified. And on its face it seemed—most of whom had already been deposed at one point prior to trial or some of whom had testified at the trial.

So we'd already had their statements at two other points, and I was trying to work with him to get that list down to discovering new evidence and not just simply rehashing the original issues. Again, that never came to fruition past me assembling that.

Regarding that, I've done—I've got copies of legal research, most of which I believe I've sent to him or provided to him, regarding his issues. And he's had opportunities to speak with me on the phone, when he's chosen to take those. It hasn't been recently.

Also, correspondence. I've attempted to correspond with him on a regular basis about mostly, again, the lack of communication on his side in the preparation of the case. So I guess I feel that I've done a sufficient and reasonable amount of preparation, as far as I could.

In terms of actually trying the case, it's difficult when, again, he hasn't been forthcoming with how he wants me to handle the issues except to say he wants me to handle the issues.

THE COURT: Are you prepared to ask Mr. Killings whatever questions you need to ask today?

[DEFENSE COUNSEL]: The—again, the representation that was made to me was that he—it's the same one that he's made to the Court—was that he did not want me to talk to him, that he was unhappy with this, and that we would speak in court.

So that's why I was attempting to set that at the beginning, Your Honor.

The matter proceeded to a trial, of sorts. Killings asserted his lawyer was failing to represent him adequately and was, in fact, colluding with the State. He asked the district court to rule on his application without offering any witnesses or evidence. The State entered ten exhibits—eight from the underlying trial and the

transcripts of the depositions of Killings' two trial attorneys. The entire proceeding appears to have taken forty minutes. Counsel did not file a trial brief, witness list, or exhibit list. Counsel did not call any witnesses or present evidence at trial. The district court issued a thorough ruling addressing each of the claims raised in Killings' application for postconviction relief.

We conclude Killings' claim of structural error is not founded. It is clear from the record that postconviction counsel advocated for Killings zealously under the circumstances. It was Killings, and not his postconviction counsel, who obstructed any progress on the case by refusing to cooperate in the postconviction proceeding and the postconviction trial. Despite Killings' obstructionist and uncooperative behavior, he was present and afforded the opportunity to participate in the postconviction trial. *Cf. Dockery v. State*, No. 13-2067, 2016 WL 351251, at *4 (Iowa Ct. App. Jan. 27, 2016). The hearing was reported. The claims were largely legal claims for which little, if any, evidentiary support was needed. The testimony of Killings' trial attorneys was submitted by deposition. *See id.* Structural error is rare. *See Washington v. Recuenco*, 548 U.S. 212, 218 (2006). Attorney-client disagreement and conflict is common. Killings' claim fails.

We next address Killings' claim his postconviction counsel was ineffective in failing to challenge the felony-murder instruction. Specifically, Killings contends assault with intent to commit sexual abuse—the predicate felony here—cannot serve as the predicate felony pursuant to *State v. Heemstra*, 721 N.W.2d 549, 558 (Iowa 2006). *Heemstra* held "if the act causing willful injury is the same act that causes the victim's death, the former is merged into the murder

and therefore cannot serve as the predicate felony for felony-murder purposes."
*Heemstra*, 721 N.W.2d at 558. Killings also cites *State v. Tribble*, 790 N.W.2d 121, 126 (Iowa 2010), for the proposition that the act causing death must be a separate act from the underlying felony.

Killings' reliance on *Tribble and Heemstra* is misplaced.

> In [*Tribble*], substantial evidence supported a finding that an act of strangulation, choking, or drowning was a factual cause of [the victim] Tracy's death by asphyxia. Substantial evidence also supported a finding of the commission of the forcible felony of willful injury causing serious injury based on a separate earlier act of blunt-force trauma to Tracy's head. The facts further supported a finding that the head trauma and asphyxia were inflicted by separate acts, with the head trauma occurring first followed by a separate act resulting in the asphyxia. Thus, separate, independent acts were identified by the evidence. Moreover, the evidence showed the act causing asphyxia was a factual cause of death. In fact, Tribble [did] not contest this evidence. Consequently, it is not important under the felony-murder analysis whether or not the separate earlier acts of blunt-force trauma were also a factual cause of death. If the acts of blunt-force trauma were also a factual cause of death, felony murder applie[d] in [that] case because a separate act of asphyxia was also a factual cause. If the acts of blunt-force trauma were not a factual cause of death, felony murder likewise applies because the blunt-force trauma would satisfy the willful-injury elements of acts intended to cause serious injury and causing serious injury, followed by a separate act causing death by asphyxia.

*Tribble*, 790 N.W.2d at 129. This ruling allows the State to submit a felony-murder theory where there were two independent assaults, even if each assault was a factual cause of death. This, for Killings, is the trouble with *Tribble*.

In this case, there was substantial evidence of two independent assaults. Dr. Schmunk testified Gottschalk died from "swelling of the brain" caused by a "combination of the blows and injury directly to the brain and probably some neck compression." The evidence suggested to him thirty-eight separate impacts. In

his opinion, "blunt impact to the head" was the cause of death but another "significant condition," meaning "a condition contributing to death but not directly related to the blunt impact," was "manual strangulation." Either would have been sufficient to cause Gottschalk's death. Evidence also suggested Gottschalk was moved from the site of the first assault, which was likely the backyard of the house, to the site of the second assault. In closing argument, the State highlighted several facts supporting movement: a distinctive bedspring behind the house aligned with lines on Gottschalk's forehead; Gottschalk had sticks and leaves in her hair; and there was a "dirt disturbance" behind the house along with dirt stains on Gottschalk's clothing. Based on this evidence, the State was justified in submitting its theory of the case. Postconviction counsel did not breach a duty in failing to raise a claim without merit. *See Nguyen v. State*, 878 N.W.2d 744, 754 (Iowa 2016).

Killings' *Heemstra* challenge fails for an additional reason—namely, *Heemstra*'s merger rule is inapplicable. As described in the direct appeal, there was sufficient evidence of assault with intent to commit sexual abuse, the predicate felony, to submit the felony-murder instruction to the jury:

> In the case before us, the victim was savagely beaten. Her shorts, underwear, and shirt were removed. Her body was placed in an unnatural position with her legs spread apart. The defendant's blood was found upon the victim's shorts and underwear. We agree with the district court that these facts raise a reasonable inference that the defendant assaulted the victim with the intent to commit sexual abuse sufficient to submit the question to the jury.

*Killings*, 2010 WL 3894161, at *4. This felony does not merge with the murder. Like arson, it is "a different crime altogether, one that requires the showing of a

different intent." *State v. Tucker*, 810 N.W.2d 519, 522 (Iowa Ct. App. 2012). The same is true of "robbery or larceny or burglary or rape." *People v. Moran*, 158 N.E. 35, 36 (N.Y. 1927); *see also State v. Pollard*, No. 13-1255, 2015 WL 405835, at *4 (Iowa Ct. App. Jan. 28, 2015). Postconviction counsel did not breach a duty in failing to raise a claim without merit. *See Nguyen*, 878 N.W.2d at 754.

Finally, even assuming a breach occurred, Killings failed to establish prejudice. The key issue in the trial was not the assailant's intent. *See, e.g., State v. Harrington*, No. 03-0824, 2004 WL 360508, at *5 (Iowa Ct. App. Feb. 27, 2004) ("Given the brutality of the nature of the killing, we conclude the district court could reasonably conclude Harrington possessed malice aforethought and acted willfully, deliberately, and with premeditation."). Rather, the issue at trial was identity. The jury concluded the unknown assailant was Killings. A different jury instruction would not have changed that nor would it have changed the outcome of the case. *See Dunbar*, 515 N.W.2d at 15.

**AFFIRMED.**